Mr. Justice James
delivered the opinion of the court.
On the 1st day of January, 1875, Addie M. Sweet and Edwin J. Sweet gave to Augustus Davis their four promissory notes of that date, payable to his order; the first three for the sum of $1,833.88 each, payable respectively in one, two and three years after date, and the fourth for the sum of $2,500, payable in three years after date, all with interest at the rate of eight per cent, per annum until paid. To secure the payment of these notes, they conveyed to Charles T. Davis and William Stickney a certain lot in the city of Washington, upon the following trusts therein declared; *189 that is, “ in trust to permit the said parties of the first part to use and occupy the said described premises * * until default be made in the payment of said notes, or any of them, * * and upon the full payment of all said notes and the interest thereon, and all other proper costs, charges, &c., at any time before the sale thereinafter provided for, to release and convey the said described premises unto the said Addie M. Sweet, her heirs and assigns. * * * And upon this further trust that, upon default being made in the payment of said notes, or any one or more of them, or the interest thereon, &c., then and at any time thereafter, to sell the said described real estate at public auction.” This deed was duly recorded on the 14th day of January, 1875.
The notes referred to were transferred to complainants before maturity and for value, and one of them was duly paid.
On the 15th of September, 1876, Davis and Stickney, trustees, executed a deed of release to Addie M. Sweet, which contained the following recital: “And whereas the said indebtedness and all interest, cost and expenses therein having been fully paid and discharged, as is evidenced by the signature hereto of Augustus Davis, the holder of the note for said indebtedness, the said party of the second part is hereby entitled to a reconveyance of the said described premises, and to have the same released and discharged of, and free of lien, claim, demand or incumbrance, by reason of said deed of trust, or anything therein contained.” This deed was signed by Augustus Davis as the “ party secured,” but he was not in fact at that time the holder of the notes or the party secured.
After the execution of this release, but before it was recorded; a negotiation was had with the defendant Samuel T. Williams, for a loan of $5,000, to be secured on the property described in the deed of trust and release above referred to, and a new deed of trust to secure the same was executed to the said C. T. Davis and R. K. Elliot. A good deal of testimony was taken on behalf of the complainants, for the purpose of showing that Charles T. Davis acted in this *190 negotiation as agent for Williams, or at least as the common agent of Williams and Mrs. Sweet ; and upon this ground it was claimed that Williams was affected by Davis’ knowledge that the release was fraudulent.
It appears that the subject of a loan to Mrs. Sweet was first mentioned by Davis to Williams, that the release was exhibited to the latter by Davis as an inducement to the loan, and that Williams required Davis to have it recorded, and to furnish him an abstract of the title before he would make the loan. It is clearly shown that all of these steps were taken by Davis at Williams’ instance, but this does not show that they were taken by him as Williams’ agent, since they were precisely such steps as Williams would naturally require of Mrs. Sweet herself, if he had negotiated directly with her as principal. The facts are consistent with the theory that he regarded Davis as her agent. Williams’ position, then, is defined by the following facts : When he made this loan, on the security of the property in question, he had before him on the record a deed of trust on the same property, securing a previous loan, and a release- executed by the trustee long before the maturity of the debt secured. He also had before him, on the same record, a recital of the facts that the Sweets had just paid $1,833.38 which they could have retained for two years, at the rate of eight per cent, interest, and that they were immediately seeking a new loan of $5,000 at nine per cent, interest, to be secured on the same property. Is he, under these circumstances, to be regarded as a purchaser for valuable consideration, without notice of the prior equity of the party whose security had been fraudulently released, and as such entitled to the protection of this court ?
It was claimed at the bar, on one hand, that in these cases the borrower and the lender, in other words, the grantor and the cestui que trust, not only accept the trustee as their common fiduciary, but hold him out to the world as such ; that the deed clothes him with power to make a release, and that strangers have a right, therefore, to assume3 without further inquiry, that he has acted according to their *191 intentions—that is to say that he has- acted properly—when he does in fact make a release. The conclusion drawn is, that if he should release the security before the debt is in fact paid, and in violation of his duty, the cestui que trust rather than the party who .confides in the propriety of that release, must be the loser, because the former has invited the latter to have that confidence.
We conceive than no such relation exists between the trustee, on one hand, and the grantor and cestui que trust on the other ; and we deny that either of them, especially the latter, holds the trustee out to the world as a person in whose acts the world may confide, and that he thereby invites strangers to act upon this ground of confidence. Such a conception confounds trustees of legal estates with agents, while the two capacities, and all the incidents belonging to those capacities, are as different as possible. It may be true— though the fact does not appear on this record—that the grantor and the cestui que trust unite, in these cases, in the selection of the trustee. Of course, in doing so, they select a person in whom they have confidence, and the law accordingly defines his relation to them as fiduciary. But that is the beginning and the end of the matter of confidence. And as for their giving to him an appearance of having authority to do whatsoever he actually does, in the matter of releasing, it seems to us to be a very plain legal proposition that, inasmuch as they are engaged in managing a matter which lies between themselves alone, they give to hirn no appearance whatever. Whether he will do his duty to them, and release only when he should do so, is simply a risk which they, especially the cestui que trust, are willing to run in the management of their own business; and a purchaser engaged in an independent transaction, has no right to construct this risk of the cestui que trust into an implied representation to him, that the trustee’s acts may be accepted as being in accordance with his duty. He is not addressed on the subject, and he is bound to know that after the trustee is once appointed, the relations of the cestui que trus to him are at arm’s length, and that the one is simply a *192 party who demands, and the other a party who owes a duty. He knows that he himself is an observer of other men’s acts for his own sake, and not in any degree upon invitation, and that no representation is made to him concerning the propriety of what may be or has been done. As stranger, therefore, he has no right to look to this phase of the transaction in giving his confidence to the trustee’s acts. Instead of considering the conduct of the cestui qui trust in confiding his interests to the hands of the trustee, he must consider the acts of the trustee, and must observe whether they are apparently consistent with his duty as indicated in the deed of trust. If Williams had a right to assume that the release which he found on the record was made in, accordance with the trustee’s duty, it was because the terms of the instrument which undertook to define his duty appeared to invite such a belief, and to indicate that a release at that time was prima facie correct. We proceed, then to consider whether Williams had a right, on this ground, to assume without further inquiry, that the release at that point of time has been made in fulfillment, and not in violation of the trust. For this purpose, let us state what we conceive to be the general principles of law applicable to this subject.
We are met, at the the outset, with the objection that the trustee possesses in these case ónly what is called a power, and that his release is inoperative to pass any estate unless it is made in the particular state of facts mentioned in the deed of trust—namely, when the debt is actually paid. This, we conceive, is a misconception. He has the legal estate, and he can transfer this at law, even if in doing so he violate his duty. What is called a power in these cases is a mere limitation of the legal power which he already has by reason of his estate, a limitation which a court of equity will enforce ; and is not an instrumentality to be exercised in order to pass the estate. If it were otherwise it would be always necessary, in making out a legal title through his conveyance to prove not only his deed but the facts in pais ; and this is never done in this District. The law on this subject was correctly laid down in Taylor v. King, 6 Munford (Va.),366: *193 “ In a court of law the vendee need not show that the conditions of the deed of trust have been complied with. There have been some opinions and dicta in this court seeming to countenance a different idea ; but this is our opinion upon due consideration.” The same construction was given to the legal effect of a deed of trust in North Carolina, in the case of Conoy vs. Troutman, 7 Iredell, 155. See, also, Beattie vs. Butler, 21 Mo., 319, 320. By the release in the case at bar the legal title passed to Mrs. Sweet, and by the second deed of trust it passed from her to Davis and Elliot. This is the effect which a court of law would be bound to give to these conveyances ; but we have to consider in this case how a court of equity must treat the title in the hands that now hold it.
If it should appear that the equity of the cestui que trust under the second deed was equal to that of the cestui que trust under the deed which has been released out of existence—in other words, that Williams purchased, not only without actual knowledge of the fraud practiced in the release, but without any duty to inquire into the propriety of the release—then this predicament of the legal title would be conclusive. The principle that where equities are equal the legal title will prevail, does not require that the legal title should he in the same hands with one of the equities. If a legal title has to be broken down, in order to give preference to one of two equal equities, it is immaterial whether it is in the hands of a trustee for the protection of one of the parties, or in those of the party himself. The rule is, that if a legal title must be gotten out of the wag, in order to give preference to one of two equal equities, a court of equity must withhold its hands, and must leave the matter as it finds it. But, notwithstanding the presence of .a legal title on one side, in the case before us, it is not pretended that it affords such protection, if the fact be that the purchaser, Williams, was, at the time of his purchase, cognizant that the trustee had violated his duty in releasing to Mrs. Sweet. In that case, the legal title of Davis and Elliot, under which Williams seeks shelter, would be charged with *194 the original trust in favor of the complainants, the cesluis que trustent under the first deed.
It is not alleged that Williams had actual knowledge of that breach of trust, nor is it necessary that he should have such knowledge, if the law charges him with what is equivalent ; namely, with constructive notice. Accordingly, it is claimed that his attention was necessarily directed to an inquiry into the propriety of the transaction, and that, as he omitted to make that inquiry, he must stand as if he had notice. The question then is, whether he was put upon this inquiry by anything contained in the instruments laid before him on the record, or by anything in the circumstances of the transaction.
The original deed of trust, which was not only constructively but actually known to him, described the debt which it secured. It disclosed a contract between the grantor and the cestui que trust, the legal effect and intendment of which was that that debt was not to be paid until a certain time, which was named in the deed. While this contract should continue in force and unaltered, it bound not only the debtor and the creditor, but the trustee ; the debtor could not insist upon .paying, and the creditor could not demand payment of the debt at any other time than that named in the deed, and the trustee could not, without a violation of his trust, disregard the existing contract. The deed itself, to repeat what we have said, which was laid before Williams on the record,informed him that, by the terms of the contract therein stated, the debt was not payable until a certain time, and that so long as that contract remained unaltered, the trustee was under an obligation to act according to its terms, and that it would be a violation of trust to release before the time named therein. lie was told that, in order that the trustee should release without violating his trust, it was indispensable that the parties, the grantor and the cestui que trust, should come to a new convention, different from that mentioned in the deed, by virtue of which the debt might be paid at an earlier day. This conception is just as intelligible to a plain business man as it is to a lawyer, and any purchaser who *195 observes that a release to the debtor has been made before the time of payment named in the deed of trust has arrived, knows that it cannot have been made properly, unless the original terms, by which the trustee was to have been governed, have been altered by the parties. He knows that the trustee’s duty is prescribed by the contract of the grantor and the cestui que trust, that the terms of this contract limit his right and authority to act, and that, if he departs from the authority indicated by the terms as originally expressed in the deed of trust, as he necessarily does in releasing before the time of payment therein fixed, he cannot have released properly, unless he had a new authority by virtue of a new convention of the parties to the contract. Now, whether any such new authority supervened must inevitably present itself to him as a question to be decided, and the very fact that such a question necessarily presents itself seems to us to be conclusive as to the purchaser’s duty. No man has a right to guess or assume that an existing agreement has been altered by a new convention. Prima facie the agreement stated in the deed is the only agreement of the parties as to the time of payment, and therefore as to the time of release, as well as the amount of the debt and the rate of interest. There is even a presumption of law that existing agreements have not been changed ; and this presumption is not a hard technicality ; it is not a clumsy device for solving questions in an easy way ; it has been founded upon common experience, and it is especially well founded in relation to contracts for the payment of debts. Debtors may sometimes anticipate the time of payment; but the instances in which they do so are so rare in comparison with the instances in which they do not that the presumption against such an alteration of their agreements is overwhelming.
The purchaser in this case was confronted, then, not only with a question, namely, whether the trustee had received a new authority by means of an alteration of the original terms indicated in the deed of trust, but with the presumption that no alteration had occurred. We are of opinion that if he undertakes to decide this question without attempting *196 to make inquiry, he makes his decision at his own risk. We do not say that he was bound to ascertain absolutely that the notes secured by the deed of trust had been paid, but we conceive that he was bound to use due diligence to that end, and that, as he omitted to make any inquiry, his equity is not equal to that of the beneficiaries under^the first trust.
It is to be remembered, in handling this question, that we are considering whether a perfectly innocent party, who has done everything that the law enabled him to do for the security of his right, shall be deprived of that security in order to protect a later comer. Certainly this is not to be done upon any doubtful theory. We see that he has been guilty of no neglect ; that he has exhausted the powers of conveyancing, and that the instrument which established his right, as wrell as the instrument which purports to determine it, was laid before the party who followed him on the same road. If we put him aside, it must be because the regular instrumentalities furnished him by the law, are construed to be capable of self-destruction, because the very instrument of his security assures his competitor that he need make no inquiry, notwithstanding a careful scrutiny detects a question. He is to be robbed of his rights because plain men are not expected to be lawyers, and are therefore not to be expected to perceive a suggestion that they may exist. We conceive it to be our duty, on the contrary, to see to it that the means of security which the law has invited him to use, shall not be rendered nugatory, by even the slightest omission on the part of others to scrutinize and give proper weight to the notices and warnings which his instrument of security contains. In behalf of his prior right, obtained and enjoyed in innocence, we are bound to extend no indulgence to ignorance or inattention. If the warning to take notice and make inquiry is there, it must be observed.
It was urged in the argument that the policy of the recording system relieves purchasers from these inquiries, but we are unable to perceive that this policy has anything to do with the question before us. Undoubtedly the policy of the record system relieves purchasers from inquiries after any *197 other instruments of conveyance or incumbrance than those which appear upon the record ; but it certainly does not undertake to alter or limit the effect of those which do appear there. If a deed contains matter which puts a pur chaser to make inquiries, it surely does so none the less because it is recorded ; and wrn have based our conclusions wholly upon what the record itself discloses. We can hardly believe that the legislature intended that the recording of a deed should diminish its effect in giving notice of what it contains, or in putting a purchaser on inquiry when it suggests an inquiry.
Entertaining these views of the effect of the original deed of trust, and of the policy of the recording system, we are of opinion that Williams failed to make inquiries which he was warned to make, and that he is, therefore, not entitled to the protection which courts of equity extend to innocent purchasers without notice. .The rights of the complainants, as beneficiaries under the first deed, should be reinstated.
The Chief-Justice dissented from the conclusions of the court.